George Lemoin RHOADES *v.* STATE of Arkansas

CR 93-1096                                     888 S.W.2d 654

Supreme Court of Arkansas
Opinion delivered December 12, 1994

*Ronald Marc Chaufty* and *Garnet E. Norwood, for appellant.*

Winston Bryant, *Att'y Gen., by:* Kent G. Holt, *Asst. Att'y Gen., for appellee.*

ROBERT L. BROWN, Justice. Appellant George Lemoin Rhoades appeals his capital murder convictions and sentence to life imprisonment without parole. He raises one point for reversal. He asserts that he was arrested without reasonable cause which tainted any subsequent statement he gave to law enforcement officers and the fruits of that statement. The point raised has no merit, and we affirm.

Bobby Friend and his wife, Charlene Friend, were beaten and stabbed to death in the bedroom of their home in DeQueen early Sunday morning on March 22, 1992. Their bodies were found two days later when Bobby Friend failed to report to work, and the DeQueen Police Department was notified. When police officers arrived at the Friend residence during the late afternoon on Tuesday, March 24, 1992, they found, in addition to the bodies, that Charlene Friend's car was missing and that the living room was in disarray, which suggested a burglary.

Other investigating agencies were called to assist, including the Sevier County Sheriff's Department and the Arkansas State Police. The following information was garnered before Rhoades's arrest the following day:

1.    Rhoades, then age 18, had been seen in DeQueen on Saturday night, March 21, 1992, in the company of Michael Friend, the victims' adopted son; Tim Oliver; and Ricky Dawson.

2.    Charlene Friend's car was found in front of William Bacon's home in Hot Springs where Rhoades was living.

3.    It appears that Leslie Chiasson may have told police prior to Rhoades's arrest that Rhoades had asked him on Saturday night, March 21, 1992, in DeQueen whether he wanted to help kill Michael Friend's mother. Rhoades also stated to Chiasson

that someone was going to die that night and made a slashing motion across his throat as he said it. The foster parent of Leslie Chiasson, Shirley Pell, told police something about Leslie's contact with Rhoades on March 24, 1992 — the night the bodies were found.

4.    Investigator Hayes McWhirter of the Arkansas State Police stopped Rhoades and Tim Oliver at about 3:00 a.m. on March 25, 1992, in Hot Springs. The two boys voluntarily went with McWhirter to the Hot Springs Police Department where they made statements after being advised of their *Miranda* rights. The two statements were not incriminating but differed in their details. The boys were released at approximately 4:00 a.m. that same morning.

5.    The crime scene at the Friends' home was inconsistent with a burglary in that items normally stolen in a burglary were not taken.

6.    Michael Friend was arrested in Hot Springs later in the day on March 25, 1992. He was transported to DeQueen where he made a statement implicating Rhoades in the double homicide.

Rhoades was arrested at about 8:30 p.m. in Hot Springs on March 25, 1992, and then transported to the Howard County Jail in Nashville. The next morning which was Wednesday, March 26, 1992, he gave an incriminating statement detailing his participation in the murders to Arkansas State Police Investigator Jerry Reed. Investigator Reed described Rhoades as alert when he gave the statement. The statement reads:

> Mike was making plans for about six months to kill his father because he had been so mean to him and his mother. We had planned before we left Hot Springs to kill them both Saturday night. We got the box cutter, the sworn (sic), and a round stick, from my house before we left. Mike went by Matt's house Saturday night and told him, someone from Little Rock was after us and he needed a weapon. So Matt gave him a brown and black wood baseball bat. When we left the Pizza Hut, I was driving, Mike was in the front, Tim and Ricky were in the back. We drove past the house, turned around and came back by the house

and parked about 20 yards past the neighbors house, and walked back to the house. Mike calmed the dogs down by talking to them because he knew them. We all entered the house. Mike was leading the way. I said, "Someone needs to turn the scanner down." I believe there was some light in the kitchen already on. We then went into the bedroom. Mike was to stand by Mr. Friend, because he wanted to make sure he didn't have time to get the gun out of the bed. I was to stand beside Mrs. Friend. Tim was to be by Mike and Ricky was to turn the lights on. We all were to make a hissing noise when we were ready. I never made the noise. I started to back out and walked back toward the door, and Mike told me, "To get back over there." So I did. The light came on and the first thing I did was cut her throat. She sat up and I pushed her back down. She turned over on her stomach. The box cutter had broke. When she raised up she called out Michael's name. At first, Mike, Tim, and Ricky were all on Mr. Friend beating and sticking him while I was cutting Mrs. Friend. When we got through, Mrs. Friend was still moving so I got the bat and hit her once on the head and back. Before we left Mike said, "We needed to make it look like a robbery." So he took some money from her purse and his billfold. Approximately $7.00. As we were going out Tim threw the VCR on the floor and I kicked the coffee table over and pushed some tapes off on the floor. We then left. Me and Mike in the Conquest, and Ricky and Tim in my truck. We stopped them once and told them we had to stop for gas. I had picked up the money from the bed when Mike had taken it from the purse and billfold. Ricky then gave me another dollar. We stopped at E-Z Mart. I pumped the gas and Mike went inside to pay and wash his hands. After that we started toward Hot Springs. Somewhere around Dierks, we stopped and threw the sword, the box cutter, and my clothes and gloves out in the woods. We travelled a little bit further and I told Mike, "That Tim and Ricky weren't as cool as we were so maybe I need to drive my truck with Tim and calm him down, and he could get Ricky with him to calm him down." The first time she raised up, she grabbed the phone, and I took it away from her, and Ricky hung it up. Ricky was hitting her several times with the bat.

Two motions to suppress this statement were filed by Rhoades before trial. Both raised the absence of probable cause to arrest Rhoades before the statement and violation of his *Miranda* rights. The trial court denied the motions. The statement by Rhoades and the evidence leading up to his arrest were then introduced by the State during his five-day trial, which commenced on February 16, 1993. Other proof presented included the testimony of Ricky Dawson, who was also charged with the double homicide and who gave a detailed description of the events, and the testimony of Eugene Dinger, a convicted felon, who testified about Rhoades's description of the murders in prison. Jennifer Horton, age 16, also testified that Rhoades told her about plans to kill Bobby Friend before the murders because he was mean to Michael and that after the murders he said that he "slit the woman's throat."

A verdict of guilty on both capital murders was returned, and Rhoades was sentenced to life imprisonment without parole.

Rhoades contends that his arrest was the outgrowth of evidence obtained as a result of Michael Friend's illegal arrest. *See Friend* v. *State*, 315 Ark. 143, 865 S.W.2d 275 (1993). More precisely, Rhoades urges that information exacted from Michael Friend following his illegal arrest could in no wise be part of the reasonable cause leading to his own arrest.

We first observe that there is some confusion as to whether Rhoades was arrested without a warrant on March 25, 1992. Rhoades contends in his brief that there was no arrest warrant and that a bench warrant was not issued until after he was in custody. The record, however, suggests that Lieutenant Mark Thamer of the Hot Springs Police Department was faxed an arrest warrant for Rhoades by State Police Investigator Hayes McWhirter, and following that, he assigned detectives from the department to take Rhoades into custody.

Even if Rhoades's arrest was warrantless, the State contends that Rhoades has no standing to raise Michael Friend's tainted statement due to a violation of Friend's Fourth Amendment rights. *See Wong Sun* v. *United States*, 371 U.S. 471 (1962). We will not address the argument of an arrest tainted by Friend's statement, however, because the argument was not made to the trial court as part of Rhoades's motions to suppress. The two motions filed sought to suppress Rhoades's statement on the basis

that it resulted from an arrest without "probable cause" and due to *Miranda* deficiencies. No mention of a tainted statement from Michael Friend is made and no argument to that effect exists in the record. It is well established that we will not address issues raised for the first time on appeal. *Hewitt* v. *State*, 317 Ark. 362, 877 S.W.2d 577 (1994); *Terry* v. *State*, 309 Ark. 64, 826 S.W.2d 817 (1992).

To the extent that Rhoades is also contending that no reasonable cause existed for his arrest, that argument is patently groundless. The various law enforcement agencies working on this case had ample reason to arrest Rhoades, as is already detailed in this opinion, and though the trial court did not give its reasons for denying the two motions to suppress, a considerable basis existed for doing so.

The record in this case has been reviewed to determine whether other reversible error exists pursuant to Supreme Court Rule 4-3(h).

Affirmed.